**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VLSI TECHNOLOGY LLC,<br><br>Plaintiff,<br><br>v.<br><br>U.S. PATENT AND TRADEMARK OFFICE, *et al.*,<br><br>Defendants. | Civil Action No. 24-cv-2244 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Pending before the Court are partial cross-motions for summary judgment challenging extensive withholdings made to a 40-page report released, in May 2026, by defendants, the U.S. Department of Commerce ("Commerce") and its component U.S. Patent and Trademark Office ("PTO") (collectively, "defendants"), in response to the record request submitted nearly three years earlier, under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, by plaintiff VLSI Technology, LLC ("VLSI"). *See* Pl.'s Mot. Partial Summ. J. ("Pl.'s Mot."), ECF No. 39; Defs.' Cross-Mot. Partial Summ. J. ("Defs.' Cross-Mot."), ECF No. 47; *see also* Pl.'s Errata to Pl.'s Mot., Ex. 9 ("USPTO May 7, 2026 Disputed Production (the Whistleblower Report)") (the

"Report") at Bates-stamp Nos. 44USPTO000728-767, ECF No. 49-10.[1] The processing of the remaining responsive records to the FOIA request is ongoing.[2]

VLSI's request for bifurcated partial summary judgment briefing on this single, fairly short Report was permitted, despite the general practice of eschewing motions for bifurcated, piecemeal summary judgment in FOIA cases, given the "troubling allegations" raised in the Report "of significant public concern" that "call into question the Patent Office's handling of the [*inter partes* review ("IPR")] proceedings, whether the rules of IPR are being applied consistently and fairly, and whether bad actors have been able to abuse the current system," with "ramifications for all patent owners and the very integrity of the IPR system." JSR ¶ 4 (Pl.'s Position Statement), ECF No. 38. As PTO's declarant succinctly summarizes the Report, "[i]t alleges that Intel set up a 'sham corporation' called Patent Quality Assurance LLC (PQA), to file an inter partes review (IPR) before the USPTO's Patent Trial and Appeals Board ("PTAB"), which Intel was unable to do itself, in order 'to undermine a verdict rendered against it by a jury . . . . wherein it was ordered . . . to pay VLSI Technology $2.18 billion.'" Defs.' Cross-Mot., Ex. B, Decl. of Caitlin Trujillo, PTO Associate Counsel for the Office of General Law ("PTO

[1] The Report at issue is submitted by both VLSI and defendants. *See* Defs.' Cross-Mot., Ex. 5, ECF No. 47-5; Pl.'s Errata to Pl.'s Mot., Ex. 9, ECF No. 49-10. In addition to the Report, VLSI's Exhibit 9 includes: (1) two-pages of transmittal emails from a Senator's office, on January 26, 2023, to PTO's Patents Ombuds Office, which then forwarded the Report the next day to Commerce's Office of Inspector General. Pl.'s Errata to Pl.'s Mot., Ex. 9 ("Report Transmittal Emails") at Bates-stamp Nos. 44USPTO000724-725, ECF No. 49-10; and (2) a two-page cover letter, dated Jan. 20, 2023, from "Anonymous" to the Chairman and Ranking Member of a committee of the House of Representatives, and a page marked "Enclosure A" for the Report, *id.* ("Report's Cover Letter") at Bates-stamp Nos. 44USPTO000726-27. Citations to Exhibit 9 will use the last three digits in the Bates-stamp number affixed to each page.

[2] This case was randomly reassigned to the undersigned Judge on August 6, 2026, at which time Commerce had processed only 252 pages over eight months and had failed to conduct a supplemental search agreed to a year earlier. *See* Minute Order (Aug. 21, 2026); Parties' Joint Status Report ("JSR") ¶¶ 11, 14, ECF No. 38. Defendants are now processing records responsive to plaintiff's FOIA request at a rate of 500 pages per month, and report that, as of October 19, 2026, PTO has 1,341 pages and Commerce has 27,334 pages remaining for processing, *see* JSR ¶¶ 3-5, ECF No. 56, and thus, at the current processing rate, absent further narrowing of the request, completing the processing may take up to 57 months, nearly 5 years, and be done in about 2031.

Decl.") ¶ 8, ECF No. 47-3. Not included in PTO's abbreviated summary are the Report's further pointed critiques about shortcomings in PTO's handling of IPR proceedings involving VLSI and Intel Corporation's ("Intel") patent dispute, Report at 730, 738, 765-767, and a "lack of legal oversight [that] has allowed Intel and its agents to subvert the US patent system in this way to unfairly profit on the intellectual property of others and avoid facing any consequences of infringement," *id*. at 730.

VLSI's FOIA request was filed in November 2023, in the wake of four years of litigation VLSI brought against Intel for infringement of two patents that began in federal court and continued in administrative IPR proceedings before PTO. In the midst of those administrative proceedings, certain members of the U.S. Congress received the Report, titled *Report – How Intel Corporation's Legal Department Intentionally Subverts the US Patent System*, accompanied by the Cover Letter, dated January 20, 2023, and signed only as "Anonymous." Report's Cover Letter at 726. A few days after receipt, a member of Congress forwarded this Report to PTO's Patents Ombuds Office, describing the document as a "whistleblower complaint regarding 'potential misconduct in an inter partes review case'" and disclaiming any knowledge about the identity of the author or "the allegations raised." Report Transmittal Emails at 725. The Report was referred the next day to Commerce's Office of Inspector General ("OIG"), *id.* at 724; PTO Decl. ¶ 16. The Report was also placed under seal on the record in the IPR proceedings, with copies sent to the parties in that administrative proceeding, including VLSI and Intel. Without consideration of the Report, PTO granted the petitions in the IPR proceedings, determining that VLSI's patents were unpatentable, a decision that VLSI has appealed to the Federal Circuit, where the Report also remains under seal, and VLSI's motion to that court to unseal the Report has been pending since May 2026.

In May 2026, defendants produced to VLSI in response to the FOIA request submitted in 2023, a heavily redacted version of the Report, with about half of the text blacked out. The parties have now cross-moved for partial summary judgment to focus on whether defendants' redactions to the Report, pursuant to FOIA Exemptions 4, 6, and 7(C), are proper. *See* Pl.'s Mot.; Defs.' Cross-Mot.

A peculiar circumstance in this dispute over the withholdings under Exemptions 4, 6, and 7(C)—which protect from disclosure responsive records implicating confidential financial information or individuals' personal privacy interests—is that the information is purportedly about Intel and another company, PQA, but those companies vociferously label this information "false," Intel's Amicus Curiae Brief ("Intel's Mem.") at 1, 2, 4, 9, 10, 12, ECF No. 44-1, and "a work of fiction," Defs.' Cross-Mot., Ex. C, Decl. of Truman Fenton, PQA Counsel ("PQA Decl.") ¶ 5, ECF No. 47-4; *see also* PTO Decl. ¶ 9 ("Both PQA and Intel contest the validity of the allegations in this document."). Both Intel and PQA decline to verify that any of the withheld information is correct, or even relates to their employees, members, banking activity, transactions or other financial information. Notwithstanding these disclaimers, the companies vigorously support PTO's withholdings to the Report and accuse VLSI of "likely prepar[ing]" this document "for the purpose of forming the basis of seeking termination of the IPR proceeding," PQA Decl. ¶ 5, "to use the court system to publish the Report so that VLSI can refer to it without incurring liability for defamation," *id.*, and to "mount a collateral attack on sealing decisions currently being considered by a federal court of appeals," Intel's Mem. at 11. For its part, VLSI does not directly address, let alone expressly deny, these accusations. *See generally* Pl.'s Mem. Supp. Mot. Partial Summ. J. ("Pl.'s Mem."), ECF No. 39-1; Pl.'s Reply

Supp. Mot. Summ. J. & Opp'n Defs.' Cross-Mot. Summ. J. ("Pl.'s Opp'n") at 11, ECF No. 51 ("VLSI does not concede to the accuracy of any of [the PQA declarant]'s claims . . .").

Putting aside the mudslinging between VLSI and Intel/PQA, this Court agrees with defendants that, despite PQA's and Intel's refusal to verify the redacted information as anything other than "fiction," PQA Decl. ¶ 5, the nature of some of the withheld information implicates confidential financial and privacy interests under FOIA Exemptions 4, 6, and 7(C). Pressing the point that "PQA's sworn position [] that the information is false…is fatal" to defendants' withholdings based on the exemptions invoked, Pl.'s Opp'n at 11, VLSI nonetheless raises no objection to "properly tailored redactions of bank account numbers, telephone numbers, citizenship status, or social security numbers," *id.* at 3. At the same time, contrary to defendants' view that no or only "limited public interest" can be found in releasing the withheld information, Defs.' Mem. Supp. Cross-Mot. Partial Summ. J. ("Defs.' Opp'n") at 8, ECF No. 47-1, the Court agrees with VLSI that "the public interest is significant," because the "Report describes allegations of misconduct that go directly to the integrity of IPR proceedings and actions by USPTO affecting public trust and confidence in the agency—and in particular an economically significant and popular adjudicative process within the agency." Pl.'s Opp'n at 7-8. For the reasons explained more fully below, VLSI and defendants' cross-motions for partial summary judgment are each granted in part and denied in part.

## I. BACKGROUND

The factual background and procedural history relevant to resolving the pending cross-motions for summary judgment are set out below.[3]

---

[3] Each exhibit and submission from the parties in support of and in opposition to the pending partial summary judgment motions, totaling more than 500 pages, has been reviewed, and only those exhibits necessary to provide context for resolution of the pending motions are cited herein.

### A. Factual Background

The FOIA request at issue is one aspect of a highly contested patent infringement dispute between VSLI and Intel dating back over seven years, beginning in 2019, when VSLI sued Intel for infringement of two patents. Compl. ¶ 8, ECF No. 1. On March 2, 2021, a federal jury found infringement, and Intel appealed the judgment to the Federal Circuit, which, on December 4, 2023, issued a decision affirming the judgment of infringement of one of the disputed patents, but reversing the judgment of infringement on the other patent, and remanding for a new trial to determine damages for the single patent. Compl. ¶¶ 12-13 (citing *VLSI Tech. LLC v. Intel Corp.*, No. 2022-1096 (Fed. Cir. Dec. 4, 2023)).

Within two months of VLSI 's victory at trial and while the appeal was pending, two companies, OpenSky Industries LLC ("OSI") and PQA, were formed on April 23, 2021 and June 14, 2021, respectively. Pl.'s Errata to Pl.'s Mot., Ex. 2, PTO Decision Issuing Sanctions in *OpenSky v. VLSI* (Oct. 4, 2022) ("PTO OSI Decision") at 6-9, 39, ECF No. 49-3; *id.*, Ex. 1, PTO Decision Issuing Sanctions in *PQA v. VLSI* (Dec. 22, 2022) ("PTO PQA Decision") at 50-51, ECF No. 49-2. Within weeks after their formation, each company filed petitions for IPR proceedings before the PTO, with each petition challenging the patentability of one of the two disputed patents. PTO OSI Decision at 59; PTO PQA Decision at 50-51. Intel had previously and unsuccessfully filed three such IPR petitions, challenging the patentability of the same two patents, and PTO had denied all three petitions. Compl. ¶¶ 9-10. Intel was barred from filing any more IPR petitions after a trial and jury verdict had found patentability. *Id.* ¶ 11. In June 2022, PTO allowed Intel to join the renewed IPR proceedings initiated by PQA's and OSI's petitions. *See* PTO PQA Decision at 13; PTO OSI Decision at 11. PTO subsequently issued, in October 2022, a decision relegating OSI "to the silent understudy role" in the IPR proceeding and sanctioning OSI for "abusive use of the IPR process," followed, in December 2022, by PTO's decisions dismissing PQA and OSI from

each proceeding and sanctioning PQA for "discovery misconduct" and "abuse of the IPR process." PTO OSI Decision at 47; PTO PQA Decision at 4-5. PTO explained in these sanctions decisions that these two companies' petitions had "copied extensively" from Intel's earlier petitions, and they had refused "to produce documentation and answer interrogatories related to [their] business purpose," and provided such "evasive" responses to interrogatories about other possible real parties in interest that they were "non-responsive." PTO OSI Decision at 7, 24-25, 36-39; *see also* PTO PQA Decision at 10, 33-34, 38.[4] Despite finding uncooperative behavior warranting sanctions by PQA and OSI, PTO allowed Intel to remain as a party to prosecute the proceedings and for the IPR proceedings to continue. *See* PTO OSI Decision at 47; PTO PQA Decision at 5-6.

While both administrative IPR proceedings and Intel's appeal of the infringement trial verdict to the Federal Circuit were pending, the House of Representatives' Committee on Oversight and Accountability received the Cover Letter, dated January 20, 2023, and the Report from "Anonymous." Pl.'s Errata to Pl.'s Mot, Ex. 9, ECF No. 49-10. The Cover Letter states that Intel sought "to undercut a federal court's decision through covert, surreptitious, and potentially illegal means," including "by creating straw companies to invalidate patents rather than abiding by the framework which governs patent infringement litigation passed by Congress and signed into law, the Leahy-Smith America Invents Act of 2011." Report's Cover Letter at 726. The Cover Letter goes on to describe how the "subvert[ing]" of the "patent system" was effectuated, claiming Intel was "likely [making] false statements, misrepresentations, and material omissions

[4] VLSI relies on PQA and OSI's evasive answers to these discovery requests to state that, "[n]either PQA nor OpenSky appeared to own any patents, make any products, or be at risk of any patent lawsuit, and they appear to have been formed for the sole purpose of filing the IPRs against VLSI's patents." Pl.'s Mot., Pl.'s Statement of Undisputed Material Facts ("Pl.'s SUMF") ¶ 15, ECF No. 39-3. Defendants only response is that this statement is "[i]mmaterial." Defs.' Cross-Mot., Ex. E, Defs.' Resp. to Pl.'s SUMF ("Defs.' Resp. SUMF") ¶ 15, ECF No. 47-6.

to" PTO "in response to PTO's "questions put forth to the company," and using a "sham corporation [to] file[] an inter partes review before the Patent Trial and Appeal Board to challenge the validity of the patent VLSI had taken Intel to court over." *Id.* Senator Thom Tillis, as a member of the Senate Judiciary Committee's Intellectual Property Subcommittee, forwarded the Report, in full, on January 26, 2023, to PTO's Patents Ombuds Office, describing the Report as a "whistleblower complaint," Report Transmittal Emails at 725, and the Report was forwarded promptly to Commerce's OIG, *id.* at 724.[5] The PQA- and OSI-initiated IPR proceedings were underway before the PTAB, which indicated that "[a] copy of the [Report] has been provided to the parties, placed on the record under seal," and that PTO "will not consider the submission." Pl.'s Errata to Pl.'s Mot., Ex. 10, PTO Order Entering the Report in *PQA v. VLSI* (Feb. 3, 2023) ("PTO Report Sealing Order") at 2, ECF No. 49-11.

Several months later, in May and June 2023, PTAB issued final written decisions on the IPR petitions, ruling for each patent challenged by OSI and PQA that "the challenged claims are unpatentable." Pl.'s Errata to Pl.'s Mot, Ex. 7, PTO Final Decision in *Intel, OpenSky v. VLSI* (May 12, 2023) ("PTAB OSI Final Decision") at 2, ECF No. 49-8; *id.*, Ex. 6, PTO Final Decision in *PQA and Intel v. VLSI* (June 13, 2023) ("PTAB PQA Final Decision") at 2, ECF No. 49-7. VLSI's appeals of both decisions are pending before the Federal Circuit. *See VLSI Technology LLC v. OpenSky Industries, LLC*, No. 23-2158 (Fed. Cir.) (appeal filed in July 2023, of PTAB's decision in OSI IPR); *VLSI Technology LLC v. Patent Quality Assurance LLC*, No. 23-2298 (Fed. Cir.) (appeal filed in August 2023 of PTAB's decision in PQA IPR). The Report remains under seal in the Federal Circuit, though VLSI moved, on May 19, 2026, with opposition from Intel and PQA,

[5] The parties debate how to refer to the Report, with VLSI borrowing the term "whistleblower report" from the description in the email transmittal from a congressional office to PTO, Pl.'s Opp'n at 3 n.3; Pl.'s Mem. at 1, while defendants, who "take no position on whether the document in fact identifies any actual wrongdoing," Defs.' Opp'n at 2 n.1, refer to this document, as does the Court, as "the Report."

to unseal the document after a heavily redacted version of the Report had been disclosed in response to the FOIA request at issue in this case. *See VLSI Tech LLC v. Patent Quality Assurance LLC*, No. 23-2298 (Fed. Cir.), ECF Nos. 168, 171, 180.

**B. Procedural Background**

Within six months of PTAB's decisions in the IPR proceedings, VLSI submitted, on November 1, 2023, a FOIA request to PTO, including requests for the following records:

> 1. Memoranda from the last two years, communicated between the Department of Commerce and the USPTO, relating to patent litigation involving actual or potential private-sector recipients of government funds in connection with the CHIPS and Science Act of 2022 ("CHIPS Recipients").
>
> 2. Records from the last two years, communicated between the Department of Commerce and the USPTO, relating to USPTO proceedings or policies involving CHIPS Recipients.

Compl., Ex. 5, Pl.'s 2023 FOIA Request ("2023 FOIA Request"), ECF No. 1-1. In response, PTO stated that no responsive records were identified and suggested that VLSI "submit a separate FOIA request that specifically identifies the private sector entities of interest." Compl., Ex. 6, PTO Letter (Jan. 10, 2024) ("PTO January 2024 Letter"), ECF No. 1-1. The following month, VLSI submitted, on February 22, 2024, the operative FOIA request to defendants, which included requests for the following records:

> 1. Memoranda from September 1, 2022 to present, communicated between the Department of Commerce and the USPTO, relating to Intel Corporation, or generically referencing actual or potential private-sector recipients of government funds in connection with the CHIPS and Science Act of 2022 ("CHIPS Recipients").
>
> 2. Records from September 1, 2022 to present communicated between the Department of Commerce and the USPTO, relating to USPTO proceedings or policies involving Intel Corporation or other CHIPS Recipients.

Compl. Ex. 7, Pl.'s 2024 FOIA Request ("2024 FOIA Request"), ECF No. 1-1.

After five months passed without production of any records, VLSI initiated this lawsuit on July 31, 2024. Over the next ten months, PTO advised VLSI that the estimated number of responsive records was 156 pages and, in October 2024, made a single production of seventeen pages with redactions. *See* JSR ¶ 2, ECF No. 8; JSR ¶ 4, ECF No. 9; JSR ¶ 5, ECF No. 10; Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s First Summ. J. Mem.") at 3, ECF No. 14-1. In May 2025, VLSI moved for summary judgment, *see* Pl.'s Mot. Summ. J., ECF No. 14, but, after the parties' conferral, defendants agreed to conduct additional searches, and VLSI's summary judgment motion was struck without prejudice, given the changing contours of issues in the case, *see* Min. Order (Aug. 14, 2025) (CRC). For the next eight months, between August 2025 and April 2026, PTO made a "small production" to VLSI, JSR ¶ 3, ECF No. 24, and, over VLSI's objections, revised its search methodology to narrow the search results, JSR ¶ 6, ECF No. 26. Given PTO's pace of processing only 167 pages of records over the four-month period between December 5, 2025 and April 6, 2026, and correlative slow pace of production, VLSI filed, on April 27, 2026, a motion to compel speedier processing such that all remaining records would be produced by May 27, 2026. Pl.'s Mot. to Compel at 1-2, ECF No. 27.

On August 9, 2026, shortly after random reassignment of this case to the undersigned, VLSI's motion to compel was granted in part and denied in part, directing, *inter alia*, Commerce "to process potentially responsive pages received for consultation from defendant [PTO] at a rate of at least 500 pages per month." Min. Order (Aug. 9, 2026). VLSI then requested bifurcated summary judgment briefing, with an initial round focused on "the propriety of Defendants' numerous redactions on [the Report]." JSR ¶¶ 2, 7, ECF No. 38. This Report had been identified as a responsive record by PTO during a July 30, 2025, supplemental search and produced to VLSI nearly one year later, on May 7, 2026, with significant redactions, including full redaction of

eighteen sequential pages numbered from 739 through 756. Defs.' Cross-Mot., Ex. A, Defs.' Statement of Undisputed Material Facts ("Defs.' SUMF") ¶¶ 2-4, ECF No. 47-2; *see also* Report at 739-756.[6] Over defendants' objection, VLSI's request for a bifurcated summary judgment briefing to focus on the legality of defendants' withholdings in the Report was granted. Min. Order (Aug. 21, 2026). The parties' cross-motions are now ripe for review. *See* Pl.'s Opp'n; Defs.' Reply Supp. Cross-Mot. Partial Summ. J. ("Defs.' Reply"), ECF No. 53.[7]

---

[6] The parties' memoranda filed in support of the pending cross-motions are docketed twice, and to simplify citation, only one of the duplicate memoranda will be cited. For example, the memorandum and exhibits for defendants' Cross Motion for Summary Judgment are docketed at ECF Nos. 47 and 48, and only the memorandum and exhibits docketed at ECF No. 47 will be cited. Likewise, the memorandum and statement of facts for VLSI's Reply in support of its Motion for Partial Summary Judgment and Opposition to defendants' Cross-Motion for Partial Summary Judgment are also docketed at ECF Nos. 50 and 51, and only the memorandum and statement of facts docketed at ECF No. 50 will be cited.

[7] In addition to the pending partial cross-motions for summary judgment, Intel has moved for leave to file an amicus brief, which motion VLSI opposes and defendants consent. *See* Intel's Mot. for Leave to File Brief as Amicus Curiae Opposing VLSI's Motion for Partial Summary Judgment at 1, ECF No. 44; Pl.'s Resp. to Intel's Mot. for Leave to File Brief as Amicus Curiae ("Pl.'s Amicus Opp'n") at 1, ECF No. 52. Courts have broad discretion to permit a submission from a third-party as amici curiae, particularly where, as here, the third-party has both "relevant expertise and a stated concern for the issues at stake in this case." *District of Columbia v. Potomac Elec. Power Co.*, 826 F. Supp. 2d 227, 237 (D.D.C. 2011) (BAH). Intel indicates the Report at issue contains "allegations against Intel…that risk reputational harm if made public," Intel's Mem. at 2, and though VLSI argues that "Intel is not a proper *amicus curiae* in this case because its interests are already fully represented by its largest owner, the Federal Government," Pl.'s Amicus Opp'n at 1, VLSI acknowledges that Intel presents additional arguments, s*ee id.* at 4 (stating that "Intel's brief is almost entirely redundant"). To highlight the alignment of interests between Intel and defendants, VLSI states that "[t]he Government is far and away Intel's largest shareholder, recently having purchased $8.9 billion, or 9.9%, of Intel's common stock," *id.* at 2, and that "[p]rior to this investment, Intel engaged in extensive negotiations with the Department of Commerce to receive billions of dollars in taxpayer funding as part of the CHIPS Act, a law that was enacted at the urging of Intel," *id.* at 3. Nonetheless, VLSI cannot dispute that Intel's interest in these proceedings is obvious from just the title of the disputed Report referring to the company, such that defendants sent Intel a formal submitter notice about the Report. *See* PTO Decl. ¶14 ("USPTO sent PQA and Intel formal submitters notices regarding the anonymous document."). Intel's motion, ECF No. 44, is therefore **GRANTED**.

Intel has cluttered the docket unnecessarily, however, with an additional amicus filing. Intel asked for leave to file a brief in reply to VLSI's opposition, prompting yet another brief from VLSI in response to Intel's reply, *see* Intel's Mot. for Leave to File a Reply in Support of its Motion for Leave to File Brief as Amicus Curiae on Oct. 7, 2026, ECF No. 54; Pl.'s Opp'n to Intel's Motion for Leave to File a Reply, ECF No. 55. Intel's motion to file a second amicus filing is **DENIED**. *See* D.D.C. LOCAL CIVIL RULE 7 (o)(1)-(o)(2) (permitting prospective amicus to submit a motion for leave to file a brief, and any party to file an opposition to such a motion, but "[t]here shall be no further briefing unless otherwise ordered by the Court.").

## II. APPLICABLE LEGAL STANDARD

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) ("A party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." (citation omitted)). "'The mere existence of *some* alleged factual dispute between the parties' will not defeat summary judgment; 'the requirement is that there be no *genuine* issue of *material* fact.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (emphasis in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). Most FOIA cases "can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011); *see also Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 58 F.4th 1255, 1272 (D.C. Cir. 2023) (Sentelle, J., concurring in the judgment) ("[T]he vast majority of FOIA cases can be resolved on summary judgment." (citation omitted)).

"Agencies may withhold from disclosure information that falls within one of [FOIA's] nine enumerated exceptions," but "[t]hose 'limited exceptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *Hum. Rts. Def. Ctr. v. U.S. Park Police*, 126 F.4th 708, 712-13 (D.C. Cir. 2025) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). "This 'strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents.'" *Id.* at 713 (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). "The agencies may carry that burden by submitting declarations attesting to the basis for the agency's decision." *Am. First Legal Found. v. U.S. Dep't of Agric.*, 126 F.4th 691, 694 (D.C. Cir. 2025) (internal quotation marks omitted) (quoting *Citizens for Resp.*

*& Ethics*, 58 F.4th at 1262). "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Aguiar v. Drug Enf't Admin.*, 865 F.3d 730, 734-35 (D.C. Cir. 2017) (quoting *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)).

## III. DISCUSSION

Defendants invoke FOIA Exemptions 4, 6, and 7(C) to justify the withholding of nearly half of the text in the Report, *see* Defs.' Opp'n at 5, with almost half of the redactions referencing all three exemptions, three redactions relying only on Exemption 4 and about thirty redactions relying only on Exemptions 6 and 7. Before turning to the application of these three exemptions, two threshold issues disputed by the parties are discussed, namely: whether resolution of the pending partial cross-motions should await the Federal Circuit's ruling on VLSI's pending unsealing motion; and whether the unverified nature of the Report's contents makes a difference in analyzing the application of FOIA exemptions.

### A. Pending Unsealing Motion In Another Court

Defendants and Intel contend that a ruling on the pending cross-motions under the FOIA should await resolution of VLSI's motion to unseal the Report pending before the Federal Circuit, *see* Defs.' Opp'n at 2; Intel's Mem. at 12-13, particularly since VLSI already has access to the full Report and questionable motives for seeking disclosure, Defs.' Opp'n at 2. As VLSI correctly points out, however, sealing orders and FOIA disclosure requirements "are separate and distinct inquiries" and the "FOIA request giving rise to this motion has been pending for *years* before the Federal Circuit briefing regarding sealing." Pl.'s Opp'n at 15 (emphasis in original). Indeed, FOIA provides federal agencies with "a significantly more lenient standard" for denying disclosure of federal agency records than does the common law standard applied to seal and restrict public

access to documents qualifying as judicial records, which are subject to a strong presumption of disclosure. *Dhiab v. Obama*, 141 F. Supp. 3d 23, 27 n.2 (D.D.C. 2015) (GK), (declining to rely on decision permitting withholding under the FOIA in resolving issue of public access to judicial records, explaining that "FOIA provides the Government with a significantly more lenient standard for denying release of records than the First Amendment."), *rev'd on other grounds by Dhiab v. Trump*, 852 F.3d 1087 (D.C. Cir. 2017); *see CNN, Inc. v. FBI,* 984 F.3d 114, 118 (D.C. Cir. 2021) (applying a "strong presumption in favor of disclosing" a "judicial record" (internal quotations and citation omitted)); *accord Eil v. U.S. Drug Enf't Admin.*, 878 F.3d 392, 398-99 (1st Cir. 2017) (describing as "inappropriate" for district court in FOIA case to "cite[] cases that concern the public's right to access judicial records" and "to invoke a disclosure-favoring standard based on a common law presumption divorced from the FOIA statutory framework," explaining that "conflat[ing] the public interest in disclosure under FOIA with a public interest in accessing judicial records, [] is erroneous because FOIA does not recognize public interests unrelated to agency functions" (citation omitted)). Given the differing standards and the differing contexts, this FOIA case is on a different track regardless of how another court resolves the issue of what public access is appropriate if the Report qualifies as a judicial record.

Moreover, even if VLSI has the full Report through the IPR proceedings, the fact that the Report is under seal in those proceedings means that FOIA's purpose "to provide transparency" remains unrealized. *See Wash. Laws.' Comm. for C.R. & Urb. Affs. v. U.S. Dep't of Just.*, 145 F.4th 63, 71 (D.C. Cir. 2025).[8] As to this point, defendants and the third parties take the offensive,

---

[8] Intel suggests VLSI could have but did not file a motion for further discovery in the IPR proceedings, presumably to verify the contents of the Report, Intel's Mem. at 5, which suggestion seems almost laughable given the fact that OSI and PQA resisted responding to discovery requests from the PTAB itself, even incurring sanctions. *See* PTO PQA Decision at 4-5; *see also* Pl.'s Errata to Pl.'s Mot., Ex. 11, PTO Second Order Regarding the Report in *PQA v. VLSI* (Feb. 9, 2023) ("PTO Second Report Order") at 3, ECF No. 49-12.

raising accusations about possible motives VLSI may have to seek the Report's disclosure under the FOIA. Defendants, for example, comment that, "[i]t continues to be remarkable that Plaintiff has still failed to explain its interest in seeking production of this document under the FOIA when Plaintiff's own filings in the Federal Circuit reveal that the Report was already produced to Plaintiff under seal." Defs.' Reply at 3. Yet this very statement makes clear why VLSI has turned to the disclosure requirements of FOIA since the Report remains "under seal," *id.*, and thereby its contents are inaccessible to the public or to publicize or use in any way. PQA's declarant goes so far to caution that making the contents of the Report public "would be libel *per se*," PQA Decl. ¶ 5, implying the concomitant risk of provoking litigation by PQA and Intel. *See also id.* (accusing VLSI of responsibility for preparing the Report "for the purpose of forming the basis of seeking termination of the IPR Proceeding" and "to use the court system to publish the Report so that VLSI can refer to it without incurring liability for defamation."); Intel's Mem. at 11 (accusing VLSI of "mount[ing] a collateral attack on sealing decisions currently being considered by a federal court of appeals").

All this mudslinging is much ado about nothing relevant here. The law is well-settled that neither the identity of the requesting party nor the intended use of the requested information is relevant in assessing an agency's compliance with the FOIA's disclosure obligations. *Wash. Laws.' Comm.*, 145 F.4th at 71-72 (FOIA "obliges agencies to make records available to 'any person' who files a proper FOIA request … and under most circumstances 'the identity of the requesting party has no bearing on the merits of his or her FOIA request.'" (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 771 (1989)); *Consumers' Checkbook, Ctr. for the Study of Servs. v. U.S. Dep't of Health & Hum. Servs.*, 554 F.3d 1046, 1051 (D.C. Cir. 2009) ("The requesting party's intended use for the information is irrelevant to

our analysis."); *North v. Walsh*, 881 F.2d 1088, 1096 (D.C. Cir. 1989) (summarizing that the "need or intended use for [] documents is irrelevant to [a] FOIA action"); *COMPTEL v. FCC*, 945 F. Supp. 2d 48, 58 (D.D.C. 2013) (RCL) ("The identity of the requester and the purpose of the request are irrelevant to whether the agency has met its own burden to justify the invocation of a FOIA exemption.").

In short, regardless of VLSI's motives, the fact that the Report is available to VLSI under a sealing order has no bearing on defendants' obligation to properly apply exemptions in response to a FOIA request for disclosure of the same document. Accordingly, defendants' and Intel's invitation for further delay by issuing a stay pending another court's ruling on an unsealing motion is declined.

**B. Unverified Contents of Report At Issue**

None of the information contained in the Report, including the withheld information, has been verified as true, and defendants, PQA through its outside counsel's declaration, and Intel as amicus, all take pains to avoid providing any such verification. For example, PTO's declarant describes the withheld information as "*appears to be* private third-party information," PTO Decl. ¶ 9 (emphasis added), and at least 48 times cabins references to this information as "purported," *see, e.g., id.* ¶¶ 20, 23, 26 (referring to "purported members and funders of PQA," "purported bank records," individual's "purported call history," and "purported entities who invested in PQA"). Separately, in response to PTO's invitation for "PQA to provide written views regarding whether the information withheld from the Report is confidential commercial or financial information properly withheld under [FOIA]," PQA Decl. ¶ 3, PQA's outside counsel provides a carefully worded declaration refusing to verify any of the information in the Report, or even to separate fact from fiction, writing, "I use the qualifier 'facially' in this declaration to avoid inferentially confirming or denying the authenticity or accuracy of the factual statements in the Report" and

noting "that harm may flow from dissemination of names, account numbers, social security numbers, etc. even if, and especially if, the allegations are false." *Id.* ¶ 8. PQA's position is that "the Report is a work of fiction with a few immaterial facts sprinkled in," *id.* ¶ 5, and that the "Report falsely accuses individuals of criminal activity," *id.*, in contrast to PTO, which does not dismiss the Report as altogether "false" or "fiction," *see generally* PTO Decl., but merely unverified. Finally, Intel apparently declined PTO's invitation to submit a sworn declaration as to its interests in nondisclosure, PTO Decl. ¶ 14 (noting PTO sent both PQA and Intel formal submitters notices), since this company opted instead to submit an amicus brief, which repeatedly characterizes the Report as "false" and "malicious," again, like PQA, without any effort to separate facts from fiction, *see generally* Intel's Mem.

Although both companies with the ability to point out the specifics of what is "false" and "fiction" in the Report about their own and their employees' actions, interactions and transactions, refuse to do so, defendants nonetheless rely on PQA's declaration to support the invocation of Exemption 4, 6 and 7(C). Certainly, an agency may properly use declarations from third parties to support determinations about the interests of those third parties in records responsive to a FOIA request. *See, e.g., Informed Consent Action Network v. Nat'l Cancer Inst.*, No. 24-cv-279 (JMC), 2026 WL 820804, at *5 (D.D.C. March 25, 2026) (denying summary judgment, explaining "the Court cannot determine whether the records are commercial absent more information about the basis for the declarant's knowledge of the publisher's practices, or, alternatively, a declaration from the publisher itself attesting to those practices"); *Pub. Citizen v. U.S. Dep't of Agric.*, No. 21-cv-1408 (APM), 2022 WL 3139003, at *2 (D.D.C. Aug. 5, 2022) (denying summary judgment to agency because agency 'could have, and probably should have, obtained sworn declarations" from the relevant "third-party" (citation omitted)); *Story of Stuff Project v. U.S. Forest Serv.*, 366 F.

Supp. 3d 66, 77 (D.D.C. 2019) (TNM) (government's use of third-party declaration was proper because "if the Government sought to show a likelihood of competitive harm with no evidence from a Nestlé or industry subject matter expert, its arguments would probably fail"). This leads inexorably to the question of what reliance, if any, may be put on a third-party declaration relaying no concrete information when analyzing the requisite balancing of personal privacy and confidential financial information with the public interest under FOIA Exemptions 4, 6 and 7(C).

VLSI's answer to this question is simple: "the Court need not even reach the issue of public interest, because Defendants have failed to show cognizable privacy interests in the first place…," Pl.'s Opp'n at 1, and fictional information in the Report "cannot possibly be PQA's actual commercial or financial information," *id*. This shortcut to a resolution favoring disclosure, though tempting, goes too far. Indeed, FOIA exemptions apply to information that may be patently and admittedly false. *See Pub. Citizen v. U.S. Dep't of Health & Hum. Servs.*, 975 F. Supp. 2d 81, 102 (D.D.C. 2013) (BAH) ("The fact that certain of this financial information also reflected fraudulent activity was not a disqualifier for withholding."). Furthermore, as Judge Kollar-Kotelly eloquently explained in *Skybridge Spectrum Found. v. FCC*, 842 F. Supp. 2d 65, 82-83 (D.D.C. 2012) (CKK), in rejecting a FOIA requester's argument that FOIA Exemption 4 "does not extend to documents/information" that are false or fraudulent, this "interpretation [is] legally unsupported [and] would also be completely unworkable because it would effectively require agencies, and later the courts, to test the truth and accuracy of each discrete item of information covered by a plaintiff's request before applying the protections afforded by Exemption 4," with the result that "cases turning on Exemption 4 would inevitably devolve into multiple mini-trials about the truthfulness and accuracy of the information withheld by the agency, multiplying proceedings exponentially and drawing upon scarce judicial and

administrative resources while contributing little in the way of furthering the purposes and policies behind FOIA." Instead, the Court concludes that FOIA exemptions from disclosure may apply to information that appears to be commercial or financial, or personal and private, even if not verified and confirmed as such by the agency. Put differently, if it looks like a duck, quacks like a duck, and waddles like a duck, it will be treated like a duck—even if no party will verify that is what it is.

With those threshold principles resolved, the Court now turns to examine whether PTO has sustained its burden of showing proper application of Exemptions 4, 6 and 7(C).

### C. FOIA Exemption 4

FOIA Exemption 4 exempts from disclosure in response to a FOIA request "trade secrets and commercial or financial information obtained from a person" that is "privileged or confidential." 5 U.S.C. § 552(b)(4). When, as here, no claimed trade secrets are at issue, an agency must establish that records withheld under this exemption are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential" to meet the burden of showing that Exemption 4 was properly applied. *Citizens for Resp. & Ethics*, 58 F.4th at 1262 (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). Here, the parties do not dispute that the information at issue was "obtained from a person"—though that "person" is anonymous and remains unidentified on the record in this case—and thus cabin their arguments to whether the Exemption 4 redactions are commercial and confidential. Satisfying the Exemption 4 requirements is only the first step since defendants must also demonstrate that "the agency reasonably foresees that disclosure would harm an interest protected by" this exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I). Defendants have carried their burden to support partial withholdings under Exemption 4 and the statutory foreseeable-harm

requirement only as to the limited information of purported individual's names, social security numbers and bank account numbers.

**1. Sufficiency of Showing that the Withheld Information is Commercial**

The terms "commercial" and "financial" are not defined in the FOIA. Absent a precise statutory definition or clarity from the legislative history, the D.C. Circuit has "consistently held that the terms . . . in [Exemption 4] should be given their ordinary meanings." *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290; *see also Citizens for Resp. & Ethics*, 58 F.4th at 1263 ("Because FOIA does not define the word 'commercial,' we have given that term its ordinary meaning." (citation omitted)); *see also Wash. Post Co. v. U.S. Dep't of Health & Hum. Servs.*, 690 F.2d 252, 266 (D.C. Cir. 1982) ("[W]e believe that the plain language of Exemption 4 covers all financial information, despite the apparent commercial focus of the Exemption."). "[I]nformation is 'commercial' under this exemption if, 'in and of itself,' it serves a 'commercial function' or is of a 'commercial nature.'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (quoting *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978)). Thus, "records that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business," fall within the scope of "commercial" information. *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290. For instance, "revenue, net worth, income, and EBITDA" information in requested documents is plainly commercial, *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009) (HHK), as are customer lists, *Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C. Cir. 1986), and audits, selling prices, profit margins and related information, *Racal-Milgo Gov't Sys., Inc. v. Small Bus. Admin.*, 559 F. Supp. 4, 6 (D.D.C. 1981) (JLG).

Defendants describe the Report information withheld under Exemption 4 as including the following information:

- "name[s] and identifying details," about the "purported," members, funders, and investors of PQA, including both individuals and entities, PTO Decl. ¶¶ 20, 22, 23a.-g. and m., 23 [*sic*-repeated number], 24, 25, 26;
- purported investments made in PQA, including "the amounts of money" invested, "the dates of these investments," and "the banks" used for investment, *id.* ¶ 22;
- "purported bank records that include banks and bank account numbers" for purported PQA funders, "a PQA manager," third-party entities, and PQA itself, *id.* ¶¶ 23a.-g. and n.;
- "purported activity between PQA accounts and other accounts," including "details about specific payments," as well as a "type of financial transaction used by PQA," *id.* ¶¶ 20, 23b.-g. and o.

Defendants' opening brief occasionally suggests that the commercial information at issue belongs to PQA, *see, e.g.*, Defs.' Opp'n at 12 ("As described in the declaration submitted by PQA, the withheld information includes information about 'PQA's members and funders, and the details of purported capital contributions and funding contributions.'); *id.* at 13 ("Public release of this banking information and transaction details could 'create a concrete risk of fraud [].'), but PQA's declarant never once identifies the withheld information as PQA's information, and carefully characterizes the Report as including only "*what the Report presents as* PQA's banking relationships, bank account numbers, account balances, deposit and withdrawal records, the payees and amounts of specific checks, the counterparties, amounts, and dates of specific domestic and international wire transfers." PQA Decl. ¶ 14 (emphasis added). Against this

backdrop of careful distancing by PQA from the Report's contents, VLSI contends that defendants "identify no PQA commercial interest in what PQA says is fictitious information written by someone else." Pl.'s Opp'n at 13.[9] As a result, VLSI argues, "Defendants have not shown that this information is PQA's actual commercial or financial information." *Id.* at 13-14.

As already addressed, *supra* in Part III.B., however, limiting application of Exemption 4 to only verifiable information pertaining to a real person would impose significant burdens upon federal agencies, far beyond their mission and their statutory obligations under the FOIA. *Skybridge Spectrum Found.*, 842 F. Supp. 2d at 79-80 (concluding Exemption 4 was properly applied to withhold "revenue information, checking account information, payment history, amounts owed to USF, customer information, and service pricing," over FOIA requester's objection that false or fraudulent information should be excluded from exemption coverage). Moreover, limiting application of Exemption 4 to only verifiable information would also contradict the plain text of the exemption, which refers to "commercial" information—a term that courts "construe[] broadly." *COMPTEL*, 910 F. Supp. 2d at 115. Under this broad construction, "information is commercial under this exemption if, in and of itself, it serves a commercial function or is of a commercial nature." *Nat'l Ass'n of Home Builders*, 309 F.3d at 38 (internal quotation marks and citation omitted). Consequently, "the term 'commercial' is not limited only to lawful activities but also extends more broadly to any type of activity bearing on commerce." *Pub. Citizen*, 975 F. Supp. 2d at 101; *see also ISC Grp., Inc. v. U.S. Dep't of Def.*, No. 88-0631 (NHJ), 1989 WL 168858, at *2-*4 (D.D.C. May 22, 1989) (holding that "financial summaries and forecasts, inventory and labor data, and other financial analyses" in an investigative report that "alleged cost charging irregularities on a government contract" were

---

[9] VLSI's opening submission is truly brief, providing less than two pages of argument, *see* Pl.'s Mem. at 6-7, leaving the bulk of its arguments to its brief in opposition to defendants' cross-motion, *see* Pl.'s Opp'n.

"commercial" information subject to Exemption 4). Thus, even if not verified, information that looks like confidential financial information, such as bank account numbers and bank transfers and transactions, qualifies as "commercial" under this well-settled understanding of Exemption 4's coverage.

Here, the withheld information, as described by PTO's declarant, PTO Decl. ¶¶ 13, 20, 22, 23a.-g., 23m-o., 23 [sic-repeat]-26, is properly understood to be "commercial" or "financial" under Exemption 4.

**2. Confidentiality**

Information qualifying as "commercial" may only be withheld under Exemption 4 if it is "privileged" or "confidential," 5 U.S.C. § 552(b)(4), and here defendants only claim that the commercial information is "confidential," not privileged. Defs.' Opp'n at 13. Under this exemption, "confidential" information is commercial or financial information that is (1) "both customarily and actually treated as private by its owner," and (2) "provided to the government under an assurance of privacy." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019). Thus, commercial information meeting the first requirement may be confidential whether provided to agencies voluntarily or otherwise. *See id.* at 437-38. The Supreme Court has contemplated whether the second condition—the government's assurance of privacy—is necessary such that "privately held information [can] *lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private," *id*. at 434-35 (emphasis in original), but in *Food Marketing*, held "there's no need to resolve that question." *Id.* The D.C. Circuit, too, has declined to resolve whether the second condition is necessary. *Citizens for Resp. & Ethics,* 58 F.4th at 1269 ("We likewise do not decide whether the second condition must be met…"). "[I]n assessing customary disclosure,

the court will consider how the particular party [providing the information] customarily treats the information, not how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001) (citing *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 872, 878-80 (D.C. Cir. 1992)); *see also Food Mktg.*, 588 U.S. at 434 (explaining that "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it," since "it is hard to see how information could be deemed confidential if its owner shares it freely").

Defendants assert that the withheld commercial information is customarily treated as private, explaining that "with respect to the third-party businesses, law firms, and individuals, none of these entities, including PQA, publicly release their banking account information or banking activity . . ." PTO Decl. ¶ 29. PQA's declarant echoes this position, stating that, "PQA has never voluntarily disclosed to the public the identities of its members or funders" and that "[a]ccount numbers, balances, and transaction-level banking records are quintessentially private financial information. PQA does not disclose such information publicly; no ordinary business does." PQA Decl. ¶¶ 13-14; *see also Gold Anti-Tr. Action Comm., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 762 F. Supp. 2d 123, 139-40 (D.D.C. 2011) (ESH) (holding that banking "transactions" and "account arrangements" involving the central banks of foreign governments were confidential information under Exemption 4, as the banks "do not customarily release such information to the public").

Highlighting again that PQA denies that information in the Report is accurate as to PQA, VLSI argues that defendants have provided no specific information about "PQA's internal confidentiality controls or restrictions placed on people or entities with which it does business,"

Pl.'s Opp'n at 12, to carry the burden of showing the information is confidential. As support, VLSI cites two non-binding out-of-circuit cases, neither of which is persuasive in this case. Pl.'s Opp'n at 12 (citing *Seife v. FDA*, 492 F. Supp. 3d 269, 276 (S.D.N.Y. 2020), *aff'd sub nom. Seife v. U.S. FDA*, 43 F.4th 231 (2d Cir. 2022) and *Am. Small Bus. League v. U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 831 (N.D. Cal. 2019)). In those two cited cases, the courts found that the non-financial information at issue qualified as confidential citing the internal and external controls imposed by the companies on access to the information. Contrary to VLSI's interpretation, however, neither of those cases supports the proposition that details on the types of internal and external access controls employed to keep information confidential are required. Here, defendants sufficiently indicate that "none of these entities" at issue "publicly release" the sensitive financial information that defendants have redacted here. PTO Decl. ¶ 29; *see also* PQA Decl. ¶ 17 ("[n]one of the information" withheld under Exemption 4 "is publicly available. It has never been published by PQA, and PQA has never authorized anyone to publish it.").

As to the second condition for confidentiality, VLSI argues that Exemption 4 should not apply because PQA has not "proven any assurances of confidentiality" from PTO or "from any members of Congress" or "anywhere in the chain or communications of the Report." Pl.'s Opp'n at 12-13. The Supreme Court has highlighted that assurances of confidentiality provided by "the party receiving [the information]" is an important consideration but VLSI does not, and cannot, dispute that such assurances may not even be required. *Food Mktg.*, 588 U.S. at 434-35; *Citizens for Resp. & Ethics*, 58 F.4th at 1269 (declining to decide whether assurances of confidentiality are required); *see also* Pl.'s Opp'n at 11. Here, PQA and Intel did not give the Report at issue to PTO—rather, the information originated from an anonymous third party—and thus defendants state the obvious, that "USPTO was never in a position to provide an assurance

of confidentiality." Defs.' Reply at 9. When PTO did receive the report, via a congressional transmittal, PTO placed the Report under seal in the IPR proceedings, identifying the document as "an unsolicited anonymous and improper ex parte communication regarding [the IPR] proceeding." PTO Report Sealing Order at 2. This sealing treatment of the Report effectively barred public access and, in these circumstances, may serve as an assurance of confidentiality. *See Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*, No. 19-cv-3749 (CKK), 2021 WL 4206594, at *8 (D.D.C. Sept. 16, 2021), *aff'd*, 71 F.4th 1051 (D.C. Cir. 2023) (holding that defendant FAA satisfied its burden to demonstrate that records were provided under an express assurance of privacy where agency provided in an order that it "must *not* release proprietary information (descriptive, design, and substantiating data received from applicants) to any party who does not have written permission from the applicant (or the certificate holder)" (emphasis in original)). Without deciding whether such an assurance of confidentiality is required in the circumstances where information is transmitted to an agency by a third-party and without any solicitation or requirement for submission by the agency, PTO has satisfied its burden of showing the withheld information is normally treated as confidential.

### 3. Foreseeable Harm

In addition to showing that information withheld "falls within a FOIA exemption," the agency must show "that the agency 'reasonably foresees that disclosure would harm an interest protected by [the] exemption.'" *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) (alteration in original) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)). To satisfy this requirement, the government must explain how disclosure of the information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing "genuine harm to [its] owner's economic or business interests," *Food Mktg.*, 588 U.S. at 441 (Breyer, J.,

concurring in part), and thereby dissuading others from submitting similar information to the government, *see Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768 (D.C. Cir. 1974), *abrogated on other grounds by Food Mktg*, 588 U.S. 427 (2019) (explaining that Exemption 4 "is intended to encourage individuals to provide certain kinds of confidential information to the Government," and to "protect[ ] persons who submit financial or commercial data to government agencies from the competitive disadvantages which would result from its publication" (quoting *Soucie v. David*, 448 F.2d 1067, 1078 (D.C. Cir. 1971))).

Defendants contend that the withheld financial information that purports to be about PQA would harm PQA's economic interests, as well as the economic interests of third parties. *See* Defs.' Opp'n at 13. Specifically, PTO's declarant asserts that release of the withheld information, "consist[ng] of PQA's purported private funding and member information, banking activity, and bank account information, to include bank account numbers," PTO Decl. ¶ 29, "would genuinely harm the economic and business interests of PQA and third-party businesses, law firms, and individuals," *id.*—despite PQA's denial that the information *is* "genuine." To support this assertion, PTO's declarant further explains that PQA "has never publicly identified [its members] or its funders" nor do PQA and the third parties "publicly release their banking account information or banking activity and to do so could lead to fraud and unauthorized access to their accounts, which would damage their economic interests," *id.* In addition, PTO's declarant turns to possible downstream harms, noting that the allegations "PQA has engaged in an illegal conspiracy, could lead to competitive harm, reputational damage, and damage its economic and business interests." *Id.*

Even without verification, the realistic format of sensitive bank account numbers and of identifying details such as social security numbers, all designed at least to appear real, even if not

PQA's real information, means that the information may be accurate, perhaps inadvertently, as to some real person. As such, disclosure of personal financial information, including bank account numbers, may pose a fraud risk for those unknown persons, and this foreseeable harm is sufficiently concrete to warrant protection. VLSI does not contest the existence of such foreseeable harm and thus "consent[s] to withholding of bank account information and social security numbers, negating any risk of fraud" to such unknown persons. Pl.'s Opp'n at 14. VLSI goes on to point out, however, that beyond exempting these realistically formatted bank account and social security numbers, "Defendants have not met their foreseeable harm burden," *id.*, by not "explain[ing] how release of fictitious information could harm any PQA economic or business interests, apart from their separate (and incorrect) foreseeable harm argument about reputational harm," *id.* The Court agrees that to the extent the withheld information under Exemption 4 may pose a concrete risk of fraud to unknown persons, that information satisfies the foreseeable harm requirement. Resultantly, defendants may withhold information in the Report that is formatted to appear to be real bank account numbers and real social security numbers. While redacting this identifying information, defendants may not withhold information about transfers between bank accounts, since defendants have not satisfied their burden of showing that any concrete competitive injury could occur from "purported," "false" and "fictional" transactional data.

Defendants contend that "reputational injury" is a foreseeable harm under Exemption 4, Defs.' Reply at 9, but that claim is inconsistent with binding precedent. The law is well settled that "Exemption 4 does not guard against mere embarrassment in the marketplace or reputational injury," and defendants may not rely on reputational injury to satisfy their burden of establishing foreseeable harm. *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 564 (D.C. Cir.

2010). Defendants' approach would "subvert[] the very purposes that Congress enacted FOIA to serve" by allowing withholdings "whenever public scrutiny might have reputational repercussions with potential knock-on commercial effects," with the result that "the government and a contractor could shield information from public view simply by agreeing to keep it secret. That is not what Congress had in mind when it protected 'citizens' right to be informed about 'what their government is up to.'" *Citizens for Resp. & Ethics*, 58 F.4th at 1267-68 (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 177 (1991)); *see also Jurewicz v. U.S. Dep't of Agric.*, 741 F.3d 1326, 1331 (D.C. Cir. 2014) ("Exemption 4, however, 'does not guard against mere embarrassment in the marketplace or reputational injury' of the kind appellants describe." (quoting *United Techs.*, 601 F.3d at 564)); *100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 142 (D.D.C. 2017) (RC) ("The D.C. Circuit has repeatedly made clear that embarrassment is not a legitimate grounds for withholding under Exemption 4. . . . the Court will not rely on the risk of embarrassment to Siemens when considering the categories of materials withheld under Exemption 4."). Therefore, defendants may not withhold information under Exemption 4 due to potential reputational harm, whether from the Report's "purported" factual information or the allegations based on that information.

Defendants defend the Exemption 4 withholdings by attempting to tie the reputational harm to damage to PQA's "economic and business interests," PTO Decl. ¶ 29, and, on this point, PQA would be expected to supply some concrete financial harms stemming from the "fictional" Report, even while maintaining its stance of not verifying any of the Report's contents. Yet, PQA's declaration fails to make any such claim, let alone showing, as to PQA's business interests, explaining only that "expos[ing] the named individuals," who may not have any

association with PQA, in a document alleging wrongdoing could result in "harassment and reputational injury." PQA Decl. ¶ 13.

Indeed, showing concrete business harms to PQA or other third parties arising from release of withheld Exemption 4 information due to possible reputational harm would be particularly difficult here since the already publicly disclosed Cover Letter and redacted version of the Report sets forth allegations about Intel and PQA in strong language. Defendants and PQA fail to sustain their burden of explaining how the risk of any *additional* reputational harm stemming from these allegations would foreseeably harm PQA's business interests more than whatever harm has already occurred. The Cover Letter alone accuses Intel of: "seemingly committing fraud to undermine a verdict rendered against it by a jury"; "creating straw companies to invalidate patents rather than abiding by the framework which governs patent infringement"; "likely mak[ing] false statements, misrepresentations, and material omissions to [PTO] in response to questions put forth to the company by" PTO's Director; and facilitating the filing by a "sham corporation" of an IPR review before PTAB. Report's Cover Letter at 726.

The redacted version of the Report repeats these allegations, starting with the title, "*Report – How Intel Corporation's Legal Department Intentionally Subverts the US Patent System*," Report at 728, and goes on to state that, *e.g.*, "Intel . . . has been abusing and improperly influencing the patent system for decades," *id.* 730; "affiliates of Intel used PQA as a front to abuse existing legal recourse in the US patent system," *id.*; "[t]his is not the first time that Intel has used devious tactics to hide their identity," *id.* at 732; "PQA is the brainchild of Intel vis-à-vis a [redacted]. These connections were not disclosed by Intel or PQA in their respective PTAB filings that were expressly required to address these issues," *id.* at 766-67; "[t]he likely purpose behind creating PQA was to undermine a jury verdict, save Intel from having to pay a judgment

to VLSI, and allow Intel a back door to bolster PQA's filing, all carried out through a post-verdict legal process that Intel may have totally abused," *id*. at 767. Even if reputational harm were relevant in evaluating the application of Exemption 4, defendants make no effort to explain how release of withheld information would lead to additional reputational harm than resulting from what has already been disclosed in the redacted version of the Cover Letter and Report.

Defendants' reliance on *WP Company LLC v. U.S. Small Bus. Admin.*, 575 F. Supp. 3d 114, 119 (D.D.C. 2021) (JEB), Defs.' Reply at 9, is misplaced since the harm identified from disclosure under FOIA Exemptions 6 and 7(C) at issue in that case was not merely reputational but could result in specific financial harm to borrowers and lenders. There, the court recognized that disclosure could "negatively impact the borrower's reputation or creditworthiness, or adversely affect its survivability and growth." *Id.* Moreover, the court found that disclosure would have tangible repercussions for the agency by "creat[ing] an incentive not to participate in the agency's programs." *Id.* (alteration in original). The instant case could not be more different. In contrast here, disclosure would have no impact on the public's perception of PTO's ability to keep information confidential and would not disincentivize participation in PTO's functions, since neither PQA nor Intel submitted the Report to PTO. Further, given the partial public release of the Report, compounded by the insistence of PQA and Intel that the Report's information is false and fiction, no specific financial harm, other than some incalculable, additional and speculative reputational damage, seems possible to arise from disclosure.

Accordingly, VLSI's summary judgment motion with respect to Exemption 4 is partially granted and defendants' cross-motion for summary judgment is partially denied. Defendants have met their burden of showing that release of the following withheld information would risk foreseeable harm in the event such information may be accurate as to some unidentified third-

party and thus may continue to withhold: (1) the names of individuals; (2) bank account numbers; and (3) social security numbers. Defendants may not withhold: (1) the names of purported members, funders, and investors of PQA, to the extent those names refer to entities rather than individuals, as defendants have not established any foreseeable harm from releasing the names of entities that are not even verified to exist; (2) the amounts and dates of investments or transactions; (3) the names of banks; and (4) transaction activity between redacted bank account numbers.

### D. FOIA Exemptions 6 and 7(C)

Defendants contend that most of the disputed withholdings are proper under FOIA Exemptions 6 and 7(C). *See* Defs.' Opp'n at 5-11. FOIA Exemption 6 permits withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), while FOIA Exemption 7(C) permits the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy," *id.* § 552(b)(7)(C). As the text of these exemptions confirms, "Exemption 7(C) is more protective of privacy than Exemption 6" by permitting withholding of law enforcement records "if disclosure would constitute an 'unwarranted' invasion of personal privacy, while Exemption 6 requires a '*clearly* unwarranted' invasion to justify nondisclosure." *ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 6 (D.C. Cir. 2011) (emphasis in original) (quoting *U.S. Dep't of Defense v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 496 n.6 (1994)). Thus, when "the request is for records compiled for law enforcement purposes, the information protected by Exemption 6 is a subset of that protected by Exemption 7(C), so [courts] need only analyze the latter." *Brown v. FBI*, 143 F.4th 481, 486 n.3 (D.C. Cir. 2025) (quoting *Kowal v. U.S. Dep't of Just.*, 107 F.4th 1018, 1030 (D.C. Cir. 2024));

*see also Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) ("If the information withheld here . . . implicat[ed] Exemption 7(C), then we would have no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C).").

Here, whether the Report was "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7)(C), is not immediately apparent, since this document was authored anonymously and sent initially to Members of Congress, before transmittal by a congressional member to PTO. PTO Decl. ¶¶ 5-7. Defendants contend that submission of the Report to Congress "is best understood as an anonymous tip alleging illegal misuse of the patent system and should therefore be considered to have been compiled for law enforcement purposes." Defs.' Opp'n at 9. Regardless, VLSI does not contest that the Cover Letter and Report were compiled for law enforcement purposes, *see* Pl.'s Opp'n at 2-3, so the following analysis assumes, without deciding, that these documents meet this threshold requirement for invocation of Exemption 7(C).

**1. Privacy Interests**

Under Exemption 7(C), the government must establish that the privacy interests implicated by disclosure outweigh the public interest served by the release of records. *See Brown*, 143 F.4th at 486 ("To invoke this exemption, an agency must find that the privacy interests at stake outweigh any public interest in disclosure." (citing *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1205 (D.C. Cir. 1991)). Defendants describe the information withheld under Exemptions 6 and 7(C) as including the following "purported" information:

- Names of "private individuals," PTO Decl. ¶¶ 20, 22, 23a.-m. and o.-r., 23 [*sic*-repeated number], 24, 25, 26;

- Individuals' "social security number," "citizenship," "employment" and "education" histories, and "telephone call history," *id.* ¶¶ 22, 23b.-c., h.-m., and o.-q., 23 [*sic*-repeated number], 24, 25, 26;
- Individuals' "investments," including the "amounts of money they invested," the "dates of these investments," and the banks they used, and "bank account information," including "bank account numbers" and "details of specific payments made," *id.* ¶¶ 22, 23a.-b. and g., 25;
- "[P]urported connection[s]" between individuals, including details of an individual's "contractual relationship with PQA including how much he would be paid," *id.* ¶¶ 23h.-l. and p.; and
- "[A]llegations against Intel employees and people associated with Intel, *id.* ¶ 21.

Defendants establish that privacy interests are implicated because the withheld information includes "numerous types of inherently personal information that is not public such as bank account numbers, account balances, deposit and withdrawal information, telephone call history logs and communication histories, employment and education histories, and an individual's alleged bankruptcy history." Defs.' Reply at 5; *see also* PTO Decl. ¶¶ 18, 20-26. VLSI concedes the privacy interests inherent in sensitive personal financial information and has no objection to the "targeted redaction" of individual names, Pl.'s Opp'n at 6, or "properly tailored redactions of bank account numbers, telephone numbers, citizenship status, or social security numbers." *Id.* at 3. For its part, Intel also contend that the withheld information implicates the privacy interests of "the individuals and entities discussed" in the Report, Intel's Mem. at 9, and, to the extent this reference is meant to cover privacy interests of Intel or PQA or other organizational entities, those interests do not count and are not weighed in this analysis, because the term "personal privacy" in

Exemption 7(C) "does not extend to corporations." *FCC v. AT&T Inc.*, 562 U.S. 397, 409-10 (2011). Recall that PQA declines to verify whether personal information associated with individuals named in the Report is correct, leaving this record unclear as to whether those individuals actually exist, or are employees of PQA, Intel or other organizational entities. Regardless, for the reasons discussed *supra*, in Parts III.B. and C.1, the application of FOIA Exemptions 6 and 7(C), as for Exemption 4, turns not on the verifiability of the existence of these individuals but on the nature of the information related to them. Therefore, information that appears to be sensitive personal information, including individuals' names, social security numbers, and bank account numbers, is treated as such.

The law is well settled that Exemptions 6 and 7(C) are "'designed to protect personal information in public records, even if it is not embarrassing or of an intimate nature.'" *Nat'l Ass'n of Home Builders*, 309 F.3d at 32 (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989)); *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007) (holding that withholding of the "names, addresses, telephone numbers, social security numbers, and other such private information" of government employees and "unnamed third-party individuals" was proper under Exemption 7(C) (internal quotation marks omitted)). Applying this standard, these exemptions protect from release under FOIA "information related to a person's employment status and employment history," *Parker v. U.S. Dep't of Just.*, 68 F. Supp. 3d 218, 231 (D.D.C. 2014) (ABJ), and "a person's name, address, place of birth, employment history, and telephone number," *Shapiro v. Dep't of Just.*, 34 F. Supp. 3d 89, 94 (D.D.C. 2014) (PLF), *aff'd sub nom. Shapiro v. U.S. Dep't of Just.*, 893 F.3d 796 (D.C. Cir. 2018); *see also Coleman v. Lappin*, 607 F. Supp. 2d 15, 22 (D.D.C. 2009) (RMC) (upholding Exemption 6 withholding of "individuals' names, titles, Social Security numbers, dates of birth, pay grades, union affiliations,

and dates of duty"). Therefore, defendants' redactions of purported individuals' names, as well as purported identifying information such as "social security number[s]," "citizenship"' information, and "education and employment history," *see* PTO Decl. ¶¶ 22-23, 25, implicate privacy interests protected by Exemption 6.

VLSI argues that no privacy interest is attached to personal financial information "relating to business judgments and relationships." Pl.'s Opp'n at 6-7 (quoting *Doe, 1 v. Fed. Election Comm'n*, 920 F.3d 866, 873 (D.C. Cir. 2019)). The cited case does not support this broad proposition. In *Doe, 1,* the D.C. Circuit affirmed the district court's decision that Exemption 7(C) was not properly applied to withhold the names of a trust and trustee. *Doe, 1*, 920 F.3d at 873. The Circuit first held that the name of the trust did not implicate privacy interests because "'personal privacy' in Exemption 7(C) refers to 'individuals,' not 'corporations or other artificial entities.'" *Id.* at 872 (quoting *AT&T*, 562 U.S. at 403). As to the named trustee, the Court explained that the "the trustee's privacy interest in his representational capacity is minimal," as opposed to the "[t]he disclosures with which the statute is concerned [which] are those of 'an intimate personal nature.'" *Id.* at 873 (quoting *Sims v. CIA*, 642 F.2d 562, 574 (D.C. Cir. 1980)). Those intimate personal interests Exemption 7(C) is designed to protect include "marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights, and reputation." *Id.* at 873 (quoting *Sims*, 642 F.2d at 574). Even a "portion" of an individual's personal finances implicate "substantial privacy interests." *Consumer's Checkbook*, 554 F. 3d at 1051 (quoting *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 685 (D.C. Cir.1976)). Therefore, information about an individual's "investments" and "bank account[s]," *see* PTO Decl. ¶¶ 22-23, are the types of "intimate" information protected by Exemptions 6 and 7(C).

### 2. Public Interests

Turning to the public interests that must be balanced against the aforementioned privacy interests, defendants correctly posit that the "only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" Defs.' Opp'n at 7 (quoting *Lepelletier v. Fed. Deposit Ins. Corp.*, 164 F.3d 37, 46 (D.C. Cir. 1999) (alterations in original) (quoting *Fed. Lab. Rels. Auth.*, 510 U.S. at 497)). According to defendants, the withholdings under Exemptions 6 and 7(C) meet this balancing test because "[p]laintiff has not identified any public interest in releasing the withheld information." *Id.* This view is plainly wrong, as defendants' own characterization of the facts surrounding the Report make clear. As defendants describe the document at issue: "[t]he Report is best understood as an anonymous tip alleging illegal misuse of the patent system." *Id.* at 9. Defendants take a myopic approach to the Report's allegations as to how Intel and other private entities may be abusing the patent system, almost as if PTO has nothing to do with this, thereby missing the point of the Report that PTO is allowing this abuse by failing to ferret out and put a stop to such abuse.

The heavily redacted version of the Report released in response to VLSI's FOIA request confirms that the Report is focused on abuse of IPR proceedings and describes PTO's seeming inability or disinterest in addressing that abuse. The Report's anonymous author names the PQA-initiated IPR proceeding in the subject line of the Cover Letter, *see* Report's Cover Letter at 726 ("**RE: *Patent Quality Assurance, LLC, Intel Corporation v. VLSI Technology LLC*, Case IPR2021-01229 (P.T.A.B.) – How Intel Corporation's Legal Department Intentionally Subverts the US Patent System** (emphasis in original)), and the Report goes on to suggest this specific proceeding is an example, describing IPR proceedings generally, *see* Report at 732 (stating

that IPR proceedings are known as "patent 'death squad'" and have resulted in the invalidation of "84% of the more than 3,000 challenged patents they have reviewed"), along with Intel's role in such proceedings, *see, e.g.*, *id.* at 733 ("Intel has hidden its connection to at least one entity . . . that has a pending IPR case before the PTAB challenging the validity of VLSI's patents . . ."); *id.* at 766 (the IPR against VLSI is the result of "Intel as the possible shadow puppeteer coordinating this entire effort to undermine VLSI's patent and the enormous damages award it received"). The Report challenges the reliability or veracity of PQA's statements in these proceedings, *see, e.g., id.* at 759-760 (alleging that PQA's statement that there were no other real parties in interest "may be an untrue statement" and "there are at least nine other parties in interest for this IPR proceeding."), and critiques PTO's handling of the IPR proceedings initiated by PQA and OSI, *see id.* at 766 ("***Director Vidal fails to conduct the same improper purpose and abuse of process analysis for Intel***." (emphasis in original)); *id.* at 738 ("[W]hile the Director did take the first step in her inquiry to uncover PQA's true motivations in filing the IPR petition and concluding they were improper and an abuse of process, she failed to go [to] the second logical step of the analysis which is determining why PQA would hide information in its Director review responses? Who else is an interested party in getting this patent invalidated? And who has direct financial interests connected to this IPR petition?"). The Report's critiques of PTO's handling of IPR proceedings are only compounded by the fact that, rather than resolving the questions OSI and PQA were sanctioned for not answering, PTAB buried the allegations and did not consider them, allowing Intel to "proceed as the sole petitioner in both IPRs," while OSI and PQA "acted as trojan horses for Intel to break its way back into the PTAB and get a second bite of the apple at invalidating VLSI's patents." Report at 737 n.44. In short, defendants' characterization that "the Report does not describe USPTO operations and does not make allegations against USPTO or any of its current

or former employees," Defs.' Mot. at 8, *see also* PTO Decl. ¶ 19 ("[T]he document does not allege any misconduct by USPTO or its employees."), is a superficial gloss masking the serious critiques of PTO's handling of IPR proceedings.

Defendants' dismissal of the Report's contents as merely describing potential misconduct by third parties misses the proverbial forest with a focus on a few trees. Put another way, to the extent this Report describes misconduct by private parties before a federal agency, that necessarily triggers public interest in whether the agency noticed this conduct and, if so, how effectively the agency addressed the conduct and assured itself as to the legality of the conduct, and then, most importantly, whether the conduct had or should have had any effect on the agency's decision. These questions go to the heart of the purpose of FOIA, which is to reveal information that "sheds light on the agency's performance of its statutory duties." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1231 (D.C. Cir. 2008) (*quoting Dep't of Just.*, 489 U.S. at 773). As the D.C. Circuit explained, when assessing the application of Exemption 6 to the Department of Agriculture's "subsidy and benefit determinations," "the public has a significant interest in being able to look at the information the agency had before it when making these determinations so that the public can monitor whether the agency is correctly doing its job," including the agency's use of a database "to monitor program compliance" because "[w]ith the information from the database, the public can more easily determine whether USDA is catching cheaters and lawfully administering its subsidy and benefit programs." *Id.* at 1231-32. This public interest in evaluating how an agency is carrying out its various statutory missions is regularly recognized in evaluating application of Exemptions 6 and 7(C). *See* Pl.'s Opp'n at 8 (citing *Humane Soc'y of U.S. v. Dep't of Agric.*, 549 F. Supp. 3d 76, 94 (D.D.C. 2021) (TNM) (rejecting Exemption 6 withholding of "information pertain[ing] to individuals and entities—names, addresses, operation type, and loan purpose,"

finding that "the public still has an interest in such information if it helps 'monitor whether the agency is correctly doing its job.'" (quoting *Multi Ag Media*, 515 F.3d at 1231)); *Gannett Satellite Info. Network, LLC v. Dep't of Just.*, No. 22-cv-475 (BAH), 2025 WL 416258, at *15-17 (D.D.C. Feb. 6, 2025) (finding public interest in state-level death-in-custody data submitted to a federal agency to enable public scrutiny of federal agency decisions to which the data pertains)). Put simply, the Report "alleges links between Intel and PQA that, if true, would mean the agency ignored its own rules and allowed an IPR to proceed improperly, potentially because of other economic interests of the federal government. . . . Answering these questions is precisely the kind of public interest that matters under FOIA, and knowing what information the agency chose not to act on or investigate sheds light on those decisions." Pl.'s Opp'n at 8.

In a twist, defendants and Intel highlight that PTO did not consider the Report's allegations in the IPR proceedings, *see* Defs.' Opp'n at 3, Intel's Mem. at 10, and use this as a basis to conclude that "[t]here is no public interest in the disclosure of information from an anonymous document" that Intel insists presents "false allegations that the USPTO never requested or considered." Intel's Mem. at 10. Whether the allegations are "false" and whether PTO appropriately investigated and addressed those allegations are not questions to be resolved in this case but certainly are questions about PTO's operations, not merely the conduct of third parties. Contrary to defendants' view, these are questions triggering a public interest in the Report's contents.[10] As VLSI puts it, "[u]nderstanding why the agency nonetheless has refused to investigate or consider these detailed allegations of serious misconduct and assessing the wisdom of those decisions is exactly the kind

[10] In its amicus brief, Intel characterizes the Report as containing "false and malicious conspiracy theories" and states that "Intel had never heard of PQA before the IPR, Intel had no involvement in PQA's decision to file its IPR petition, Intel has no financial interest in PQA, Intel has never provided PQA with any funding, and Intel never communicated with PQA until after PQA's IPR was instituted." Intel's Mem. at 9. As noted *supra* n.7, Intel opted to make these statements only in an amicus filing rather than in a sworn declaration before this Court.

of public interest central to FOIA." Pl.'s Opp'n at 9. This Court agrees that the Report bears on understanding potential abuse of IPR proceedings and how PTO manages, or not, IPR proceedings to guard against such abuse, and these matters are of significant public interest.

### 3. Balancing Privacy and Public Interests

Weighing the privacy interests inherent in individual names, identifying information, and bank account numbers against this significant public interest, defendants properly withheld individual names and associated identifying information, including social security numbers, educational history, employment history, and bank account numbers, under Exemptions 6 and 7(C). These redactions are proper given the significant privacy interest inherent in such personal information, and because knowledge of individuals' names and other identifying information would not further the public interest of understanding PTO's management of adjudicative proceedings and safeguarding the integrity of IPR proceedings in particular. *See SafeCard Servs.*, 926 F.2d at 1206 ("[U]nless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure.").

Defendants properly establish foreseeable harm from disclosure of those purported names, which may belong to real individuals, and associated identifying information, explaining that disclosure within a Report alleging misconduct "would damage [individuals'] reputation, cause them embarrassment and harassment, increase their vulnerability to fraud and identity theft, and lead to negative impacts on their employment and financial well-being." PTO Decl. ¶ 28. Defendants have established that significant privacy interests are implicated when sensitive personal information is tied to "allegations of misconduct." Defs.' Opp'n at 7; Intel's Mem. at 8

(citing *Bloomgarden v. U.S. Dep't of Just.*, 874 F.3d 757, 761 (D.C. Cir. 2017) (finding, in applying Exemption 6, that the individual privacy interest in a "proposed discipline letter…that [] contains mere allegations" is "quite substantial"). In addition, defendants have identified the additional specific harm of the risk of "fraud and identity theft." PTO Decl. ¶ 28.

Notwithstanding some public interest in identifying the purported individuals named in the Report generally, when applying both Exemptions 6 and 7(C), unsubstantiated allegations of misconduct are not enough to outweigh the private interests inherent in sensitive personal information. *See, e.g., Bernegger v. Exec. Off. for U.S. Att'ys*, 334 F. Supp. 3d 74, 89-90 (D.D.C. 2018) (RDM) (holding that "unsubstantiated allegations of misconduct" did not justify disclosure of "names, address[es,] and telephone numbers" under Exemptions 6 and 7(C) (internal citations omitted)); *Whitlock v. U.S. Dep't of Def.*, No. 20-cv-3246 (JMC), 2025 WL 721876, at *7 (D.D.C. Mar. 6, 2025) (holding that Exemption 6 withholding of individual "identities, contact information, and unsubstantiated allegations of misconduct" in a document containing "references to uncharged/unproven misconduct" was proper (internal citations omitted)). Therefore, though public interest in the Report may be strong, because the author is anonymous and the contents are unverified, this public interest does not outweigh the significant privacy interests in the names of purported individuals and associated identifying information, such as telephone numbers, educational history, employment history, and bank account numbers relayed in the contents, surrounded by allegations of misconduct.

Defendants may not, however, withhold the relational details between individuals, including "purported call history" or "purported connection[s] with another named individual." *See, e.g.,* PTO Decl. ¶ 23.i-k. Such "relational detail is what makes the document probative of the alleged scheme," Defs.' Reply at 10, as defendants' recognize, and public interest in such details

is therefore stronger. Defendants' contention that name-redaction alone is insufficient to protect privacy is unpersuasive. As VLSI suggests, defendants should redact names using "alphanumeric markers" which are "uniquely identifiable and consistent throughout all documents produced." Pl.'s Opp'n at 4 (quoting *Mattachine Soc'y of Wash., D.C. v. U.S. Dep't of Just.*, 267 F. Supp. 3d 218, 228-29 (D.D.C. 2017) (RCL)). That is the best way to protect individual's sensitive private information, such as names and telephone numbers, while also shedding light on the alleged connections between Intel, PQA, and PTO during the initiation and pendency of the IPR proceedings. Defendants may not withhold the names of businesses or organizational entities, as those types of artificial entities have no privacy interest. *See supra* Part III.B.1. To the extent, then, that names of PQA's purported "funder[s]," PTO Decl. ¶ 23, are merely legal entities, they may not be withheld under Exemption 6 and 7(C).

Further, when applying this consistent name redaction and substituted identifiers, defendants also may not withhold information about purported individuals' investments and bank account transactions. Redacting identifying information like bank account numbers and individual names sufficiently protects individuals' privacy interest, and as a result the public interest weighs in favor of releasing this investment and transactional information for the additional insight revealed, similar to the relational details. Therefore, defendants must release information about purported individuals' investments, including the "amounts of money they invested" and the "dates of these investments," and "details of specific payments" made through bank accounts. *See, e.g.*, PTO Decl. ¶¶ 22, 23a.-b. and g.

Accordingly, defendants' cross motion for summary judgment motion with respect to withholdings under Exemptions 6 and 7(a) is granted in part and defendants may continue to withhold: (1) names of individuals; and associated (2) bank account numbers; (3) social security

numbers; (4) citizenship information; and (5) employment or education histories, as defendants have met their burden of showing that the privacy interests implicated by the release of such information outweigh the public interest served by their release. VLSI's summary judgment motion challenging these same withholdings as improper is also granted in part as to relational information, including telephone call history, connections between purported individuals and associated investment and bank transactions, which defendants must partially release using unique identifiers for each individual.[11] Both motions are otherwise denied.

## IV. CONCLUSION

For the foregoing reasons, both VLSI's and defendants' motions for partial summary judgment are granted in part and denied in part as to defendants' withholdings under Exemptions 4, 6 and 7(C). Specifically, defendants' motion for summary judgment is partially granted as to withholding the names of individuals, bank account numbers, social security numbers, citizenship information, employment history and education history, but otherwise denied. VLSI's motion for summary judgment is partially granted to require release of the names of entities and the following information associated with individuals' redacted names, using unique identifiers for each individual: telephone call history; the amounts, dates of, and banks used for, investments; and financial transaction activity between redacted bank account numbers identified by unique identifiers associated with each individual, but otherwise denied.

Defendants will be directed to release, by December 21, 2026, to VLSI the portions of the Report improperly withheld under Exemptions 4, 6 and 7(C).

An order consistent with this Memorandum Opinion will be entered contemporaneously.

[11] Defendants also assert that they have "released all reasonably segregable information." Defs.' Opp'n at 14. FOIA requires that "[a]n agency shall ... take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii)(II). As the foregoing analysis has identified the potential for improper withholdings, any determination of the propriety of the segregation of releasable information would be premature.

Date: November 13, 2026

**BERYL A. HOWELL**
United States District Judge